IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

James D. Reed and Deborah Reed.,

               Plaintiffs,

    v.

Columbia Gas Transmission, LLC, et al.,

               Defendants.

Case No. 2:22-cv-3417

Judge Graham

Magistrate Judge Jolson

<u>Opinion and Order</u>

Plaintiffs James and Deborah Reed own land in Hocking County, Ohio.  The prior land owners entered into an oil and gas lease with Ohio Fuel Gas Company, the predecessor-in-interest to defendant Columbia Gas Transmission, LLC.  Plaintiffs have brought this diversity action alleging various state law claims arising out of Columbia's decision to plug and abandon a gas storage well on their land.  They also assert a claim for breach of the implied covenant to develop the oil and gas rights.  This matter is before the Court on the parties' cross-motions for summary judgment.  For the reasons set forth below, the Court grants summary judgment to Columbia.

## I.     Factual Background

### A.     The 1950 Lease

In 1950, landowners Harold and Margaret Eigensee entered into an oil and gas lease with Ohio Fuel.  The lease covered about 80 acres over three contiguous parcels of land in Hocking County.  The 1950 Lease granted Ohio Fuel the right to "all the oil and gas in and under the lands hereinafter described together with the exclusive rights to drill for, produce and market oil and gas and also the right to enter thereon at all times for the purpose of drilling and operating for oil, gas and water."  Doc. 57-4 at PAGEID 1264.  The lease had a 20-year term and for so much longer thereafter as oil or gas was produced in paying quantity.  *Id.*

Under the 1950 Lease, Ohio Fuel was to "deliver to Lessor in tanks or pipe lines one-eighths (1/8) of the oil produced and saved from the premises."  *Id.*  Ohio Fuel was also to pay a $200 "annual rental" payment for each gas well from which gas was marketed.  *Id.*  The 1950 Lease imposed on Ohio Fuel a duty to "drill a well producing oil or gas in paying quantity" within one

year.  *Id.*  If Ohio Fuel failed to do so, then it became obligated to pay delay rental payments of $42 per year.  There is no indication on the record that Ohio Fuel drilled any wells under the 1950 Lease.

**B.**     **The 1952 Lease**

The parties entered into a superseding lease in January 1952, which provided for the addition of gas storage rights.  The 1952 Leases granted to Ohio Fuel "all the oil and gas in and under the lands hereinafter described together with the exclusive right at all times to enter thereon and drill for, produce and market oil and gas and the exclusive right to inject, store and remove gas, regardless of the source thereof, in and from the oil and gas strata underlying said premises and to possess, use and occupy so much of said premises as is necessary and convenient for the purposes herein specified."  Doc. 57-4 at PAGEID 1258.  The 1952 Lease had a term of "twenty (20) years and so much longer thereafter as oil or gas is produced therefrom in paying quantity, or gas is being injected and stored therein or removed therefrom."  *Id.*

The addition of gas storage rights carried through to other parts of the lease.  Ohio Fuel was still obligated to deliver to the lessor one-eighth of any oil produced, but it now was to pay a $200 annual rental for each gas well for which "gas is being marketed, injected, stored or removed."  *Id.* at PAGEID 1259.  Ohio Fuel had to "drill a well producing oil or gas in paying quantity, or a well to be utilized for storage purposes on said premises by Apr. 27, 1952" or pay $84.00 each year in delay rental payments.  *Id.*

An important provision of the 1950 Lease which remained the same in the 1952 Lease was the lessor's right to "lay a line to any gas well" on the property and "take gas produced from said well for use for light and heat in one dwelling house on said land, at Lessor's own risk, subject to the use and the right of abandonment of the well by Lessee."  *Id.*  "The first two hundred thousand cubic feet of gas taken each year shall be free of cost," with any amount in excess to be paid at a market rate.  *Id.*

Ohio Fuel soon drilled three gas wells on the premises.  *See* Am. Compl. ¶¶ 16–18.  All three wells were "drilled for the purposes of injecting and removing stored gas."  Doc. 61-2 at PAGEID 2836–37, Answer to Request for Admission No. 11.  That is, the wells were drilled exclusively as gas storage wells and not as production wells.  It is undisputed that no oil and gas has ever been produced from the leasehold under the 1952 Lease.

A cabin has always stood on the property, and a line was placed to supply gas to it.  *See* J. Reed Dep. at 139.  Of the three storage wells on the property, the gas to the cabin was supplied by the one designated as Well 9172.  *See* Am. Compl. ¶ 21.

2

### C.    Developments in the 1990s and early 2000s

In 1990 a company named Creative Stucco Corporation acquired the land subject to the recorded 1952 Lease.  *See* Doc. 59-1 at PAGEID 2088; Doc. 57-4 at PAGEID 1258.  James Reed owned Creative Stucco.  *See* J. Reed Dep. at 15.  By this time, Columbia Gas had succeeded the interests of Ohio Fuel.  Creative Stucco later conveyed the land to the Reeds in August 2001.  *See* Doc. 59-1 at PAGEID 2090.

In 1993, Creative Stucco and Columbia entered into an agreement which the parties refer to as the "Overburn Agreement."  It increased the annual volume of free gas to which the lessor is entitled under the 1952 Lease from 200,000 to 300,00 cubic feet.  *See* Doc. 18-3 at PAGEID 394.  The Overburn Agreement further provided that the lessor's "right to receive free gas is derived solely from the referenced [1952] lease."  *Id.*.

In the mid-1990s, Columbia contracted with a sister company, Columbia Natural Resources (CNR) and another party to conduct oil and gas exploration in the region where the Reed's property is located.  *See* Cable Dep. at 97–101.  The exploration activities lasted from 1995 to 2011 and included two-dimensional seismic surveys[1] of the leasehold and nearby areas in Hocking County.  *See id.* at 101, 106; J. Reed Dep. at 78–79, 158.  Upon identifying areas of likely oil or gas reserves, CNR drilled 48 wells, none of which were on the leasehold, though some were within a three-mile radius of it.  *See* Cable Dep. at 54, 106; Cable Decl., ¶ 7; J. Reed Dep. at 79.  Twenty-six of the wells drilled were "dry holes," 15 wells "likely did not provide a return on investment," 3 wells "may or may not have had a return on investment," and 4 "likely had a return on investment."  Cable Decl., ¶ 7.  These results reflected a "high rate of failure" even after the seismic surveys had indicated the potential for reserves, and no production wells were drilled on the Reeds' property leasehold.  *Id.*

### D.    Columbia Notified the Reeds of its Intent to Plug Well 9172

On September 18, 2021, a land agent contracted by Columbia sent written notice to the Reeds that Columbia intended to plug and abandon Well 9172.  *See* Doc. 59-2 at PAGEID 2129.

---

[1]  A seismic survey is a geophysical exploration technique in which an energy wave is bounced "off underground oil and gas deposits back up to small, strategically positioned sensors on the surface."  *Nat. Res. Def. Council v. Nat'l Park Serv.*, 250 F. Supp. 3d 1260, 1275 (M.D. Fla. 2017).  "The data acquired during the survey may be either two or three dimensional, depending on the layout of the geophones and the location of the energy source points, but 3–D seismic surveys produce better images and successfully identify subtle geological features."  *Id.* (changes made).  *See also Musser Davis Land Co. v. Union Pac. Res.*, 201 F.3d 561, 566 (5th Cir. 2000) ("[T]he seismic method obtains this information [about subsurface structures] by measuring the reflection, refraction, and velocity of shock waves created by explosive charges set off in holes in the earth.").

The notice told the Reeds that this would "result in the retirement of your tap from Columbia's facilities and the corresponding cessation and termination of free natural gas" to the cabin. *Id.*

The Reeds received a letter dated January 4, 2022 which reiterated Columbia's intent to plug and abandon Well 9172. *See* Doc. 18-8 at PAGEID 518. The letter further stated that Columbia would need first to obtain approval from the Federal Energy Regulatory Commission (FERC). The letter advised that the project would involve, among other things, "earth disturbance, the presence of workers and equipment, . . . [and] grading and excavation." *Id.* Columbia estimated that the project would begin in March 2022 and last four months. Finally, the letter gave the Reeds notice of their right to protest the project to FERC.

The land agent sent another letter to the Reeds on January 13, 2022. *See* Doc. 18-9 at PAGEID 522. It too stated Columbia's intent to plug and abandon Well 9172 upon FERC approval. It again advised that the project would require "temporary workspace" and could involve earth disturbance, grading, excavation, and new or modified access roads. *Id.* The letter stated that Columbia would follow FERC's erosion control and revegetation plan during construction and restoration activities. The letter gave a longer, six-month timeframe for the duration of the project. Information was provided for the Reeds to contact the land agent or FERC to raise questions or concerns about the project.

### E.     Columbia Receives FERC Approval and Plugs Well 9172

On January 3, 2022, Columbia filed with FERC a plan to plug and abandon four natural gas storage wells, including Well 9172. *See* Doc. 59-6 at PAGEID 2314. The other three wells were not on the Reeds' property. The application contained extensive statements and plans concerning Columbia's proposed compliance with applicable environmental regulations, including those relating to erosion control, revegetation, and restoration.

On March 2, 2022, FERC filed an Environmental Assessment Report. *See* Doc. 59-6 at PAGEID 2297. The Repot contained an environmental analysis of the proposed project. It found that the project would require tree clearing and excavation to plug Well 9172. *See id.* at PAGEID 2300. Columbia would be required to implement erosion control and topsoil conservation measures and to stabilize and revegetate the disturbed area. *See id.* at PAGEID 2301. Impact on vegetation was expected to be "minor." *Id.* at PAGEID 2303. The Report concluded that Columbia's proposed project would comply with applicable regulations and "would not constitute a major federal action significantly affecting the quality of the human environment." *Id.* at PAGEID 2308.

Upon receiving FERC's approval, Columbia began clearing trees from approximately 0.65 acres around the wellhead in March 2022. *See* Medziuch Dep. at 57; Doc. 59-6 at PAGEID 2388. With Well 9172 being on a slope, work crews had to excavate land to create a level working area, onto which composite mats with underlayment were placed. *See* Karns Dep. at 30; *see also* Medziuch Dep. at 64 (testifying that site preparation, with grading and erosion control, taking place in July 2022). By October 27, 2022 Columbia completed its plugging activities and then backfilled the hillside cut, regraded the land at pre-existing contours, and reseeded the disturbed area with grass. *See id.* at 94, 101–102. Columbia retained an environmental inspector, who issued a report December 1, 2022 stating that backfill, final grading, and restoration was 100% completed and that vegetative coverage was at 93%. *See* Doc. 69-1 at PAGEID 3253.

## II. Procedural Background

The Reeds originally filed this suit in state court. After Columbia removed the case to federal court, the Reeds amended their complaint. The Amended Complaint also named Columbia Energy Ventures, LLC, as a defendant.

The Amended Complaint asserts eight claims. The first is for breach of the 1952 Lease. Plaintiffs allege that Columbia breached the lease by unilaterally terminating the supply of free gas (also known as "house gas") to the cabin. The second claim likewise alleges that Columbia breached the Overburn Agreement by terminating the supply of house gas to the cabin.

The third claim is for diminution of value of real property. Plaintiffs allege that the termination of house gas has caused the value of their property to be diminished.

The fourth cause of action is for conversion. Plaintiffs assert that Columbia's breach of the 1952 Lease should result in Columbia forfeiting its right to produce gas from the property. Plaintiffs further contend that Columbia has improperly taken "Plaintiffs' native gas despite its breach of its lease obligations." Am. Compl., ¶ 59.

Plaintiffs' fifth claim is for destruction of property. They allege that in connection with plugging Well 9172, Columbia destroyed trees and other vegetation and damaged the surface of the land.

The sixth cause of action is for ejectment. Plaintiffs allege that because Columbia has breached the 1952 Lease, it should be required to surrender its rights and be ejected from the land.

The seventh claim is for declaratory judgment that Columbia has breached the 1952 Lease and Overburn Agreement. Plaintiffs seek the remedy of an order requiring Columbia to reinstate the supply of house gas.

Plaintiffs' eighth claim is for breach of an implied covenant to produce. This claim is brought against Columbia and also Columbia Energy Ventures, LLC, which allegedly has been assigned the development rights for plaintiffs' land. Plaintiffs assert that Ohio law imposes an implied duty to produce upon lessees in oil and gas leases. They further allege that Columbia has failed to make reasonable efforts to produce oil and gas under the 1952 Lease.

Each party has moved for summary judgment. Plaintiffs seek summary judgment on their claim for breach of the implied covenant to produce. Defendants seek summary judgment as to all claims.

## III. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th

Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

## IV. Columbia's Motion for Summary Judgment as to Counts One through Seven

### A. Breach of Contract – Counts One and Two

Count One of the Amended Complaint alleges that Columbia unilaterally terminated the Reeds' supply of house gas in violation of the 1952 Lease. The elements of a breach of contract claim are: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damage or loss to the plaintiff. *White v. Pitman*, 2020-Ohio-3957, ¶ 37, 156 N.E.3d 1026, 1036 (Ohio Ct. App.).

Columbia argues that the Reeds cannot demonstrate a breach because the right to house gas was subject to Columbia's right to abandon Well 9172. The Court agrees. The 1952 Lease provided, "Lessor may lay a line to any gas well on said lands and take gas produced from said well for use for light and heat in one dwelling house on said land, at Lessor's own risk, **subject to the use and the right of abandonment of the well by Lessee**." Doc. 57-4 at PAGEID 1259 (emphasis added). The plain language of the 1952 Lease conditions the Reeds' privilege to receive house gas on Columbia's right to abandon the well. There are no contractual restrictions on Columbia's right to abandon the well. Further, there are no allegations that Columbia acted improperly or in bad faith in deciding to abandon the well. To the contrary, Columbia's decision received FERC approval.

Columbia exercised its right to abandon Well 9172 in 2022. Columbia concedes that the Reeds still have a right to receive house gas if they chose to "lay a line" to one of the two remaining gas storage wells on their property. Importantly, the lease imposes the duty on the Reeds to place a line to another well. The evidence shows that Columbia, through legal counsel, inquired of the Reeds at least twice in the summer of 2022 as to their desire to lay another line. *See* Doc. 70-1 at

PAGEID 3291 (June 9, 2022 email); *id.* at PAGEID 3293 (Aug. 10, 2022 email). James Reed testified that Columbia offered to allow the Reeds, at their expense, to lay a line to one of the other wells before service to Well 9172 was cut off in late 2022. *See* J. Reed Dep at 51. The Reeds chose not to lay another line because of the cost, and they switched their cabin over to propane. *See id.* at 51–53; D. Reed. Dep. at 58–59.

In response to Columbia's motion for summary judgment, plaintiffs do not dispute that Columbia had a right to abandon Well 9172. Nor do they dispute that, had they opted to lay a new line, the 1952 Lease imposed the cost of doing so on them. Instead plaintiffs argue that prior to the lawsuit Columbia "denied the Reeds the opportunity to lay another gas line to other storage wells." Doc. 66 at PAGEID 3190. They cite the initial September 18, 2021 written notice from Columbia, which stated that Columbia's plan to plug and abandon Well 9172 would result in the "termination of free natural gas to the service address." Doc. 59-2 at PAGEID 2129. The notice further stated that the Reeds "may need to convert to an alternative source of energy." *Id.* Plaintiffs also cite some pre-suit communications between legal counsel in which Columbia's early posturing suggested that it might no longer be willing to supply house gas. *See* Doc. 18-10 at PAGEID 525.

Plaintiffs' response brief does not use the term "anticipatory breach," but that appears to be the gist of what they are now arguing. The Court must reject this argument. The Amended Complaint does not contain a claim for anticipatory breach or repudiation, even though Columbia's conduct occurred before the filing of the suit in state court and well before the filing of the Amended Complaint in April 2023. *See Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788–89 (6th Cir. 2005) (holding that a plaintiff may not raise a new legal claim for the first time in response to defendant's motion for summary judgment when the new claim is based on facts within plaintiff's knowledge at the time the complaint was filed). Moreover, the Reeds both testified that in the summer of 2022 – several months before Well 9172 was plugged – Columbia offered to allow them to lay a line to an existing well to receive the free supply of house gas. *See* J. Reed Dep. at 51, 134–35; D. Reed Dep. at 59. Because Columbia offered to perform its contractual obligation to supply house gas in the event the Reeds laid a line, the Reeds cannot prove an essential element of anticipatory breach. Namely, they cannot prove that Columbia expressed an "unequivocal repudiation" of the contract. *AMP V, LP v. Long Point Energy, LLC*, 2025-Ohio-201, ¶ 58, __ N.E.3d __ (Ohio Ct. App.).

The Court reaches the same legal conclusions with respect to the second claim for breach of contract. The Overburn Agreement increased the volume of house gas to which the Reeds were

8

entitled, but it did not otherwise change the operation of the 1952 Lease. The Reeds' right to house gas "derived solely" from the 1952 Lease. Doc. 18-3 at PAGEID 394. Because Columbia had a right to abandon Well 9172 and because the duty to lay a new line was placed on the Reeds, Columbia did not breach the Overburn Agreement.

Accordingly, the Court finds that Columbia is entitled to summary judgment on the claims for breach of the 1952 Lease and the Overburn Agreement.

### B. Diminution of Value, Conversion, Ejectment, and Declaratory Judgment – Counts Three, Four, Six, and Seven

The Reeds allege in the third cause of action that Columbia's improper termination of house gas to the cabin has caused the value of their property to decline. Columbia argues that diminution in value is not a standalone claim but rather a measure of damages. *See Ludolph v. Tuel & Thoenen, Inc.*, 6 Ohio Misc. 117, 124, 214 N.E.2d 696, 701 (Ct. Com. Pl. 1965). Columbia further argues that the claim fails because plaintiffs cannot prove that the termination of house gas was in breach of the 1952 Lease. Plaintiffs' response brief concedes that diminution of value is a method of calculating damages. *See* Doc. 66 at PAGEID 3191. The Court agrees with Columbia's argument that diminution of value is a measure of damages and that plaintiffs cannot prove an underlying breach of contract. Thus, Columbia is entitled to summary on the diminution of value claim.

The fourth claim is for conversion and it requires a showing that defendant wrongfully exercised domain over property belonging to plaintiffs. *See Joyce v. Gen. Motors Corp.*, 49 Ohio St. 3d 93, 96, 551 N.E.2d 172, 175 (Ohio 1990). The Amended Complaint alleges that Columbia has taken native gas from the Reeds' property and that such activity is improper because Columbia forfeited its rights to produce gas when it breached the 1952 Lease by terminating the supply of house gas. But plaintiffs now concede that their conversion claim fails because discovery produced no evidence that Columbia has ever produced native gas from their property. *See* Doc. 66 at PAGIED 3203 n. 13. For this reason, and because plaintiffs cannot prove an underlying breach of contract, the Court finds that Columbia is entitled to summary judgment on the conversion claim.

The sixth and seventh claims for ejectment and declaratory judgment fail as well. Both are contingent upon plaintiffs demonstrating that Columbia breached the 1952 Lease and thereby forfeited its contractual rights. Because the Reeds have not demonstrated that Columbia breached the lease by terminating the supply of house gas, Columbia is entitled to summary judgment on the claims for ejectment and declaratory judgment. *See Maddox v. Reser*, 110 Ohio App. 213, 217–18, 168

N.E.2d 923, 926–27 (Ohio Ct. App. 1959) (claim for ejectment can be defeated by defendant's showing of a contractual right of possession).

### C. Destruction of Property – Count Five

In their fifth claim, the Reeds allege that "[w]ithout right to do so, Defendant has entered on Plaintiffs' property." Doc. 18 at ¶ 64. They further allege that Columbia destroyed trees and other vegetation and damaged the surface of the land. They seek recovery for damage to the property and for emotional distress. The Reeds explain in their brief that the damage to the land's surface relates to alleged destabilization of the backfilled slope on the hillside where Well 9172 was located.

Columbia's motion for summary judgment assumes that Count 5 is a tort claim of some sort. *See* Doc. 61 at PAGEID 2799. Columbia argues that the claim is defeated by the terms of the 1952 Lease, which contractually limits Columbia's liability for property damage to losses involving crops. Columbia also argues that, to the extent plaintiffs seek to impose additional standards of care on Columbia, the claim is preempted by Natural Gas Act, which commits such matters to FERC's jurisdiction. In response, the Reeds do not clarify the nature of the cause of action or discuss the standards which would apply to their tort claim. Their brief in fact muddies the waters. They argue both that Columbia failed to comply with the FERC certificate in restoring their property and that Columbia breached an implied covenant to restore the surface of the estate.

In attempting to address the fifth cause of action, the Court starts with the Amended Complaint. Based on the allegations alone, the claim would appear to be one for trespass. The Reeds allege that Columbia forfeited its rights under the 1952 Lease because it cut off their house gas. *See* Doc. 18 at ¶ 63. The next allegations are that Columbia entered the land "[w]ithout right to do so" and damaged the property and caused emotional distress. *Id.* at ¶¶ 64, 65. In Ohio, a "common-law tort in trespass upon real property occurs when a person, without authority or privilege, physically invades or unlawfully enters the private premises of another [and] damages directly ensue." *Apel v. Katz*, 83 Ohio St.3d 11, 19, 697 N.E.2d 600 (Ohio 1998) (internal quotation marks omitted). However, as explained above, the Court finds that Columbia did not forfeit its contractual rights by terminating the supply of house gas. The 1952 Lease grants Columbia authority to "enter" the land for purposes related to its storage of natural gas. Doc. 57-4 at PAGEID 1258. Thus, any claim for trespass fails.

The Court next looks to how the claim is labeled. The Amended Complaint calls it a claim for "destruction of property." A civil claim for destruction of property is uncommon, if not rare, in

10

Ohio.[2] But it is a recognized cause of action. An Ohio Court of Appeals has rejected the argument that there is no legal basis for a claim of malicious destruction of property. *See Thomas v. Murry*, 2021-Ohio-206, ¶ 60 (Ohio Ct. App.). The court reasoned:

> Ohio courts routinely recognize civil actions for injury to personal property. As set forth in R.C. 2307.011(J), a "tort action" is defined as "a civil action for damages for injury, death, or loss to person or property." "This definition is broad and does not require that the cause of action be based in common law as opposed to statute." *Gurry v. C.P.*, 2012-Ohio-2640, 972 N.E.2d 154, ¶ 13 (8th Dist.). As recognized by this court, "a 'tort action' is present where one brings a private cause of action for property damage." *Id.*

*Id.*, ¶ 61. The court did not discuss the elements of a civil claim for malicious destruction of property, as a motion for sanctions was at issue. But the court's discussion of the facts and its holding that plaintiff had a basis to assert the claim (sufficient to avoid sanctions) suggests that a plaintiff at a minimum must show that defendant, without consent or right, knowingly damaged property belonging to plaintiff. *See id.*, ¶ 62. This would mirror the elements of a criminal offense for the same type of conduct. *See, e.g.*, O.R.C. § 2909.07 (criminal mischief).

The Court finds that a tort claim for destruction of property fails here because the parties are in a contractual relationship in which Columbia had a right to enter and use the property. The 1952 Lease speaks both to Columbia's right to enter the property and to Columbia's standard of care in using the land. The lease grants Columbia the right to enter the land for purposes of drilling for oil and gas and for storing and removing gas, and it grants Columbia the right to abandon a well. The lease also provides that Columbia may "possess, use and occupy so much of said premises as is necessary and convenient for the purposes herein specified." Doc. 57-4 at PAGEID 1258. Even if Columbia's conduct in plugging Well 9172 caused damage to the surface estate, the factual record is undisputed that Columbia had a right to enter and use the land in connection with its well-plugging operation. The 1952 Lease, not tort law, governs the parties' conduct in relation to each other. *See Netherlands Ins. Co. v. BSHM Architects, Inc.*, 2018-Ohio-3736, ¶ 27, 111 N.E.3d 1229, 1236 (Ohio Ct. App.) ("Generally, the existence of a contract precludes a tort claim on the same underlying actions, unless the defendant also breached a duty owed independent of the contract.").

---

[2] Malicious destruction of property has long been a criminal offense, although the various aspects of that behavior (criminal mischief, vandalism, arson, criminal damaging, etc.) are now separate offenses under the criminal code. *See City of Toledo v. Miller*, No. L-78-038, 1978 WL 214857, at *2 (Ohio Ct. App. Sept. 15, 1978) (discussing former O.R.C. § 2909.01, entitled "Malicious Destruction of Property"); O.R.C. §§ 2909.03, 2909.05, 2909.06, 2909.07.

The Amended Complaint does not assert a breach of contract claim with respect to Columbia's removal of trees or damage to the surface of the land. The Court could hold that the Reeds cannot assert a new claim in response to the motion for summary judgment. *See Tucker*, 407 F.3d at 788–89. However, Columbia's motion – which argued that 1952 Lease sets forth the applicable standard of care – clearly anticipated that contractual issues would arise, and they did. Plaintiffs' response brief argues that Columbia breached an implied contractual right to restore the land. Because plaintiffs' new theory has been briefed, the Court will address it.

The 1952 Lease gives Columbia the right to enter, use, and occupy the land "as is necessary and convenient" for Columbia to exercise its contractual rights, including that of storing gas and abandoning a well. Regarding Columbia's standard of care in using the land, the lease further provides that "Lessee shall bury when so requested by Lessor, all pipe lines used to conduct gas or oil off the premises and shall pay all damage to growing crops caused by operations under this lease." Doc. 57-4 at PAGEID 1259. Columbia argues that the lease's express provision for compensation for damaged crops means that other types of surface damage caused by lessee's operations are not compensable.

The case law cited by Columbia fully supports its position. In *Voisard v. Marathon Ashland Pipe Line, L.L.C.*, 2006-Ohio-6926, ¶ 2 (Ohio Ct. App), defendant had a contractual easement to lay, operate, and maintain a pipeline on plaintiff's property and to use the premises in a manner "necessary" to exercising its rights. The contract, entered into in 1952, provided that defendant would pay the landowner "any damages caused by it to growing crops or fences by the laying, erecting, maintaining, operating or removing of said pipe lines." *Id.* (emphasis omitted). Defendant removed trees from the property so that it could conduct aerial inspections of the pipeline, and plaintiff sued for damages for breach of the easement. The court rejected plaintiff's claims and granted summary judgment to defendant. The court first found that plaintiff had failed to produce any evidence that the removal of trees was not necessary to defendant's exercise of rights. The court further found that "giving the damages clause its plain and ordinary meaning," "the parties did not intend to include damages for the cutting of trees or timber." *Id.* ¶ 10. The court examined the dictionary definition of "crops" and found that the trees at issue, which were not fruit-bearing trees, did not meet the definition. Thus, trees were not among the items for which defendant owed a duty to compensate plaintiff. *See id.*

Similarly, in *Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618, 621 (6th Cir. 2008), the defendant had a contractual easement dating from 1947 to lay, operate, and maintain a pipe on

plaintiffs' land in Ohio. Defendant was to "pay any damages which may arise to crops and fences from the laying, maintaining, operating and final removal of said pipe line." *Id.* Defendant notified plaintiffs of its intent to clear a stand of pine trees in order to access and inspect the pipeline, and plaintiffs sued to enjoin the removal of the trees and, in the alternative, for damages. After a bench trial in which the district court determined that clearing the trees was "necessary and convenient" to defendant's exercise of rights, the court rejected plaintiffs' claim for compensation, and the Sixth Circuit upheld that decision. *Id.* at 622. Relying on *Voisard*, the Sixth Circuit held: "Here, the agreement provided for damages to crops and fences, not trees. The plain and ordinary meaning of these words is clear." *Id.* at 632.

In this case, when the original parties entered into the 1952 Lease, they expressly contemplated that the lessee would drill wells for production or storage, would have the right to abandon the wells, and would have the right to enter, occupy, and use the land in a manner "necessary and convenient" for those purposes. The Reeds do not dispute that Columbia's clearing of trees and other vegetation was necessary and convenient to Columbia's exercise of its contractual right to plug and abandon Well 9172. Nor do the Reeds dispute that Columbia's excavation of the hillside to create a level surface for its equipment was necessary and convenient. The 1952 Lease provides for compensation only when "growing crops" are damaged by Columbia's operations. The trees which Columbia removed were not crops, and the Reeds do not argue otherwise. *See* Doc. 59-6 at PAGEID 2361 (Environmental Report submitted to FERC identifying the trees as hardwoods such as oak and maple). Under the plain language of the lease, the Court finds that the Reeds are not entitled to compensation for the trees and other vegetation which Columbia removed when plugging Well 9172 or for alleged damage to the land's surface.

The Reeds assert that there exists an implied covenant to restore the surface of the estate. This assertion is not persuasive for two reasons. For one, courts will not read an implied duty into a contract when express terms govern the matter. *See Fifth Third Mortg. Co. v. Chicago Title Ins. Co.*, 758 F.Supp.2d 476, 485 (S.D. Ohio 2010) (holding that an alleged implied duty "does not supplant express contract terms") (citing *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 75 Ohio St.3d 433, 662 N.E.2d 1074 (1996)). The 1952 Lease expressly addresses what the lessee's obligations are when exercising its rights in using the land – to bury pipelines when requested and to pay for damaged crops.

Secondly, although the Reeds raise the claim of an implied covenant to restore, they fail to discuss its contours or application. Perhaps this is not surprising, as the Court's research found just

three Ohio cases which mention the implied covenant to restore.  *See Rudolph v. Viking Int'l Res. Co.*, 2017-Ohio-7369, ¶ 74, 84 N.E.3d 1066, 1085–86 (Ohio Ct. App.); *Yoder v. Artex Oil Co.*, 2014-Ohio-5130, ¶ 45 (Ohio Ct. App.); *Alford v. Collins-McGregor Operating Co.*, 2016-Ohio-5082, ¶ 15 (Ohio Ct. App.).  None of the three cases addressed the substance of such a claim.  In *Randolph*, a lessee to an oil and gas lease abandoned a well without plugging it.  The lessor sued for breach of an implied covenant to restore, asserting that defendant had an implied duty to plug the well.  Without discussing the nature of the claim or the standards imposed, the Ohio appellate court held that the lower court had improperly dismissed the claim as time-barred.  *See Rudolph*, 2017-Ohio-7369, ¶ 74. In both *Yoder* and *Alford*, the courts cited an energy industry article in stating that implied covenants have been recognized in oil and gas leases.  *See Yoder.*, 2014-Ohio-5130, ¶ 45 (citing Keith B. Hall, *The Application of Oil & Gas Lease Implied Covenants in Shale Plays: Old Meets New*, 32 Energy & Min. L. Inst. 304 (2011)); *Alford*, 2016-Ohio-5082, ¶ 15 (same).  The courts then listed examples of potential implied covenants, including a duty to restore the surface, but they did not otherwise explain or discuss the implied covenant to restore the surface because such a claim was not at issue.

Looking outside Ohio case law, the Court notes the general view is that an implied covenant to restore the surface estate does not exist in oil and gas leases.  *See* 62 A.L.R.4th 1153, § 8.  Indeed, the  author of the energy industry article cited in *Yoder* and *Alford* states that the "implied duty of surface restoration is not widely recognized in jurisprudence."  *See* Keith B. Hall, *The Application of Oil & Gas Lease Implied Covenants in Shale Plays: Old Meets New*, p. 8, https://emlf.org/wp-content/uploads/2016/06/Min.Law_Sample-Outline.Hall_.pdf (citing a lone case which recognized the covenant).  Protection for landowners instead comes in one of several forms: negotiating an express right to land restoration in the lease; claiming that the lessee's conduct was not a necessary operation, such that it violated the clause commonly found in oil and gas leases that the lessee's use of the land is limited to that which is necessary and convenient to carry out the lease's purposes; or asserting that the lessee's conduct violated a body of statutory or regulatory requirements which have been developed to protect landowners.  *See* 62 A.L.R.4th 1153, §§ 8, 10, 12.

The Reeds argue that the original parties to the 1952 Lease – in limiting damages to injury to growing crops – could not have envisioned or intended to allow Columbia to destabilize the hillside on which Well 9172 was located.  But the language of the lease controls.  *See Corder v. Ohio Edison Co.*, 177 Ohio St. 3d 319, 328, 252 N.E.3d 32, 41 (Ohio 2024) ("That the drafters of the easements did not contemplate or foresee Ohio Edison's use of herbicides is of no import.  First, as discussed above, the rights and limitations of the easements find their source in the easements' text. . . .

14

Second, provided that an easement's language does not prohibit it, an easement holder is entitled to vary the mode of enjoyment and use of the easement by availing himself of modern inventions if by doing so he can more freely exercise the purpose for which the grant was made.") (internal quotation marks omitted). Columbia deemed it necessary to excavate the hillside and to later backfill the slope. Again, the Reeds do not argue that the excavation and backfilling were unnecessary to the well-plugging operation.

The Reeds are not left without recourse. They allege that Columbia failed to comply with FERC's requirements as to how to restore the backfilled hillside. *See* Doc. 66 at PAGEID 3196 (arguing that "the FERC certificate obligated Columbia to properly restore the Reed Property"). The FERC certificate's conditions required Columbia to implement "topsoil conservation measures," "successfully revegetate/stabilize disturbed areas," and restore "[o]riginal topographic contours." Doc. 59-6 at PAGEID 2301. It further provided that "Columbia will perform all abandonment and restoration activities in accordance with . . . the Commission's Upland Erosion Control, Revegetation and Maintenance Plan" and with other specific standards cited by FERC. *Id.* at PAGEID 2298–99. The Reeds maintain that Columbia did not comply with applicable standards regarding slope stability and that scarps (steep banks caused by soil faults or erosion) are developing on the hillside as a result.

The Reeds' claim for noncompliance with the FERC certificate must be brought to FERC. As one court explained:

> The relevant statute and regulations place the power to police compliance squarely upon FERC. FERC's authority for imposing such conditions is provided in 15 U.S.C. § 717f(e): "The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." Section 717m authorizes FERC to investigate violations of provisions of FERC's orders, *see* 15 U.S.C. § 717m(a), and FERC regulations specify procedures for such investigations, see 18 C.F.R. §§ 1b.1—.20. In accordance with 18 C.F.R. § 1b.8, any person may request that FERC institute an investigation. FERC can bring an action in district court to enforce its orders. *See* 15 U.S.C. § 717s(a).

*Portland Nat. Gas Transmission Sys. v. 4.83 Acres of Land*, 26 F.Supp.2d 332, 339 (D.N.H. 1998). This Court does not have jurisdiction over the Reeds' claim, to the extent they seek an order requiring Columbia to restore the land in compliance with the FERC certificate. *See id.* ("The district court does not have the authority to enforce compliance with pre-construction conditions [of the FERC certificate]."); *Millennium Pipeline Co. v. Certain Permanent & Temp. Easements*, 777 F.Supp.2d 475, 481 (W.D.N.Y. 2011) ("[W]hen a landowner contends that the certificate holder is not in compliance

with the certificate, that challenge must be made to FERC, not the court."); *Columbia Gas Transmission LLC v. 0.85 Acres*, No. CIV. WDQ-14-2288, 2014 WL 4471541, at *7 (D. Md. Sept. 8, 2014) ("Columbia's noncompliance with the FERC Certificate would be an issue for FERC, not this Court."); *Guardian Pipeline, L.L.C. v. 295.49 Acres of Land*, No. 08-C-0028, 2008 WL 1751358, at *16 n.6 (E.D. Wis. Apr. 11, 2008) ("[T]o the extent the Landowners allege that Guardian is not in compliance with the terms of the FERC certificate regarding route alterations, that challenge must be made to FERC, not the court.").

Accordingly, the Court grants Columbia's motion for summary judgment as to the Amended Complaint's fifth cause of action for destruction of property, but does so without prejudice to the Reeds bringing a claim of noncompliance before FERC.

## V. Cross-Motions for Summary Judgment as to Count Eight

### A. Introduction

The Reeds' eighth and final claim is for breach of an implied covenant to produce. Though sometimes called an implied covenant to "produce," *see Am. Energy Serv. v. Lekan*, 75 Ohio App. 3d 205, 210, 598 N.E.2d 1315, 1318 (Ohio Ct. App. 1992), the duty is more accurately called an implied covenant to "develop," *see State ex rel. Claugus Fam. Farm, L.P. v. Seventh Dist. Ct. of Appeals*, 145 Ohio St. 3d 180, 186, 47 N.E.3d 836, 843 (Ohio 2016). The covenant refers to an obligation to make reasonable efforts to develop oil and gas interests, not to an absolute duty to produce oil and gas when it is practically impossible or not economically prudent.

It has long been the law in Ohio that where an oil and gas lease is silent as to the development of production wells, "there is an implied covenant in [the] lease to reasonably develop the lands, by drilling and operating such number of wells as would be ordinarily required for the production of the oil contained in such lands, and afford ordinary protection to the lines." *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 127, 48 N.E. 502, 505 (Ohio 1897). The rationale behind this rule is that "[l]ong-term leases of mineral rights under which there is no development of the land are void as against public policy." *Claugus,* 145 Ohio St. 3d at 184, 47 N.E.3d at 841 (citing *Ionno v. Glen–Gery Corp.*, 2 Ohio St.3d 131, 134, 443 N.E.2d 504 (Ohio 1983). "When a lease does not require development within a definite period, a court will impose an implied covenant to reasonably develop, absent express provisions to the contrary." *Id.*

Both sides have moved for summary judgment on this claim. It is undisputed that neither Ohio Fuel nor Columbia have ever drilled a well producing oil or gas under the 1952 lease. The

only wells on the premises have been used for natural gas storage.  The Reeds assert that Columbia and Columbia Energy Ventures have implied duties to explore and produce, but they have failed to do so.  According to the Reeds, a reasonable owner of oil and gas rights would conduct exploration efforts using 3D seismic surveys to determine if oil or gas reserves are likely to exist below their property.  Defendants maintain that the terms and structure of the 1952 Lease foreclose application of the implied covenant to develop.  They further argue that even if the implied covenant does exist, the Reeds cannot satisfy their burden of showing that defendants have breached it.

Before addressing the parties' arguments, the Court begins with reviewing the nature of the 1952 Lease.  "It is universally recognized within the field that oil and gas leases commonly contain several key provisions," and these include the "granting clause," the "habendum clause," and the "royalty clause."  *Jacobs v. CNG Transmission Corp.*, 332 F.Supp.2d 759, 764 (W.D. Pa. 2004) (citing treatises).  The granting clause establishes the rights which the lessor conveys to the lessee.  In the 1952 Lease, the lessor conveyed the right to drill for and produce oil and gas from the property and the right to store gas.  The lease is known as a "dual purpose" lease.  *See id.* at 765; *Mason v. Range Res.-Appalachia LLC*, 120 F.Supp.3d 425, 429–30 (W.D. Pa. 2015) ("With the development of storage fields, it became relatively common for oil and gas leases in the Appalachian Basin to be 'dual purpose' leases permitting production or storage of gas.").  Along with the dual rights to produce and store, the lessee under the 1952 Lease was granted the "concomitant right" to use the premises as is necessary and convenient to carry out the purposes of the lease.  *Jacobs*, 332 F.Supp.2d at 765.[3]

The habendum clause defines the duration of the lease estate.  *See Mason*, 120 F.Supp.3d at 440.  "In virtually all contemporary leases, the habendum clause provides for a defined primary term (typically one to ten years) and provides that the lease may continue into an indefinite secondary term 'so long thereafter' as oil or gas (or other specified minerals) is produced in paying quantities."  *Id.* (internal quotation marks omitted); *accord Bohlen v. Anadarko E & P Onshore, L.L.C.*, 150 Ohio St. 3d 197, 200, 80 N.E.3d 468, 472 (Ohio 2017).  In dual purpose leases, the secondary term continues "based upon activities other than production of oil or gas in paying quantities."  *Mason*, 120 F.Supp.3d at 440.  The 1952 Lease has a primary term of 20 years and an indefinite secondary term

---

[3]  In *Jacobs*, the court examined an oil and gas lease from 1956.  The court's decision includes an excellent review of the development of oil and gas leases in the first half of the 20th century and the typical features of leases in the 1950s.  The same can be said of the *Mason* decision, dealing with a lease from 1961.

which continues so long as oil or gas is produced in paying quantities or gas is being stored. *See id.* at 440–41 (noting that oil and gas leases in the Appalachian Basin commonly provide for the "storage of non-native gas to extend the lease into the secondary term").

Compensation under oil and gas leases can take several forms and may not appear in a single clause. *See id.* at 441; *Jacobs*, 332 F.Supp.2d at 766. Compensation may include royalties, delay rentals, storage rentals, and house gas. *See id.* at 766–67. Royalties are payments fixed on a percentage of the value of oil and gas produced from the property. *See Mason*, 120 F.Supp.3d at 441. "A delay rental is a payment to the lessor to maintain the lease during the primary term if the lessee has not commenced operations on the property." *Id.* ("The purpose of a delay rental is to relieve the lessee from the duty of immediately developing the property, which was an implied requirement in early oil and gas leases."); *accord Bohlen*, 150 Ohio St. 3d at 200, 80 N.E.3d at 472. A storage rental is payment for the use of the land to store gas. *See Jacobs*, 332 F.Supp.2d at 767.

The 1952 Lease has some variation of each of these forms of compensation. In addition to the house gas privilege discussed in Section IV.A above, the lease requires the lessee to "deliver" to the lessor one-eighth of the oil produced.[4] The lease also provided for a delay rental of $84 for each year during the primary term in which a well was not drilled for production or storage purposes, but it is undisputed that Ohio Fuel drilled the first storage well within months of the execution of the lease. The 1952 Lease provides for an annual per-well rental payment of $200 "for each gas well from the time and while gas is being marketed, injected, stored or removed." Doc. 57-4 at PAGEID 1259. This last form of compensation cannot be called a pure storage rental because the payment is not only for wells used for gas storage but also for any well while gas is being marketed.

**B.      Ways to Preclude the Implied Covenant**

The implied covenant of reasonable development "arises only when the lease is silent on the subject." *Harris*, 57 Ohio St. at 128, 48 N.E. at 505. The Ohio Supreme Court has described two ways in which parties can preclude the implied covenant from being imposed. *See Claugus*, 145 Ohio St. 3d at 186, 47 N.E.3d at 843. One way is for parties to agree to an express disclaimer of implied covenants. *See id.*; *Alford v. Collins-McGregor Operating Co.*, 152 Ohio St. 3d 303, 306, 95 N.E.3d 382, 386 (Ohio 2018). The 1952 Lease did not contain an express disclaimer of implied covenants.

The second way to negate the implied covenant to develop is for the parties to agree that development must commence within a certain time period. *See Claugus*, 145 Ohio St. 3d at 186, 47

---

[4]  The parties' briefing appears to assume that the lessor's right is to a one-eighth royalty payment, rather than to the physical delivery of oil.

N.E.3d at 843 (stating that the covenant may be implied if "the lease fails to refer specifically to the timeliness of development"); *Alford*., 152 Ohio St. 3d at 306, 95 N.E.3d at 386. In *Ionno v. Glen–Gery Corp.*, 2 Ohio St.3d at 132, 443 N.E.2d at 506, a coal lease provided for royalties and for an annual payment of advance minimum royalties (similar in effect to a delay rental). The lease contained "no time period" by which mining operations were to begin. *Id.* The lessee argued that "the payment of an annual minimum rent or royalty relieve[d] them of their obligation to diligently mine the premises." *Id.*, 2 Ohio St.3d at 133, 443 N.E.2d at 507. The Ohio Supreme Court disagreed, holding that the parties' basing of compensation on the payment of royalties manifested their intent for the lessee to "work the land with ordinary diligence." *Id.*, 2 Ohio St.3d at 134, 443 N.E.2d at 507. The court reasoned:

> The fact that the lessees have continued to make annual payments for a period of over eighteen years does not alter their responsibility to develop the land within a reasonable time. The questions of working diligently and of paying rent or royalties are entirely separate matters. An annual advance payment which is credited against future royalties cannot be viewed as a substitute for timely development. To hold otherwise would be to reward mere speculation without development, effort, or expenditure on the part of the lessees. It would allow a lessee to encumber a lessor's property in perpetuity merely by paying an annual sum. Such long-term leases under which there is no development impede the mining of mineral lands and are thus against public policy.

*Id.*, 2 Ohio St. 3d at 134, 443 N.E.2d at 508.

The Ohio Supreme Court has made clear that the rule announced in *Ionno* applies with equal force to oil and gas leases. *See Claugus,* 145 Ohio St. 3d at 186–87, 47 N.E.3d at 843. However, a typical oil and gas lease contains terms which set forth a specific time period for development. Oil and gas leases commonly contain "drill or pay" language which appears in the delay rental clause. *See Bohlen v. Anadarko E & P Onshore, LLC*, 2014-Ohio-5819, ¶ 20, 26 N.E.3d 1176, 1183 (Ohio Ct. App.) ("'Traditional oil and gas leases in Ohio contain a "drill or pay clause," which is also known as a delay rental provision. This provision allows the lessee to defer drilling a well during the primary term of an oil and gas lease by compensating the lessor for the delay'") (quoting Ohio Real Estate Law at Section 47:9). The drill-or-pay duty, combined with the statement of a definite time period in the habendum clause's primary term, supplies the "certain period" as to the timeliness of development which is necessary to preclude imposing an implied covenant during the primary term. *See Claugus,* 145 Ohio St. 3d at 185–87, 47 N.E.3d at 842–43.

The 1952 Lease contained a drill-or-pay provision requiring the lessee to "drill a well producing oil or gas in paying quantity, or a well to be utilized for storage purposes on said premises

by Apr. 27, 1952 or pay to Lessor Eighty-four [dollars] ($84.00) each year thereafter until such well is drilled or this lease surrendered." Doc. 57-4 at PAGEID 1259. It also contained a 20-year primary term. The lease thus precluded the imposition of an implied covenant to develop during the primary term. *See Claugus,* 145 Ohio St. 3d at 187, 47 N.E.3d at 883.

### C. Columbia's Argument for a Broad Rule Precluding the Implied Covenant

The decision in *Claugus* dealt with a lease still in its primary term. The situation here is different because the primary term of the 1952 Lease ended 53 years ago. The lease has not expired because the habendum clause permits the lease to continue into the indefinite secondary term for so long as one of the dual purposes of the lease is being accomplished. Columbia, and Ohio Fuel before it, have maintained gas storage wells on the premises since 1952. So the issue becomes whether an implied covenant to develop should arise during the secondary term. It does not appear that this issue has been directly addressed by Ohio case law.

Columbia draws a connection between the conduct which holds the lease in the secondary term and the type of agreement needed to preclude imposition of the implied covenant. Columbia argues that its successful holding of the lease in the secondary term means that the implied covenant does not arise so long as it continues to store gas on the premises. Columbia's broader proposition is that the "implied covenant does not apply to dual purpose leases." Doc. 70 at PAGEID 3278. According to Columbia, so long as it is doing one or the other of the dual purposes – production or storage – it is satisfying the parties' bargain. *See* Doc. 63 at PAGEID 3062 (noting that the habendum clause uses the disjunctive "or" in stating that production or storage will hold the lease during the secondary term). To put it another way, if mere storage of gas was good enough in the contracting parties' eyes to continue the lease into the secondary term, then it should also suffice to preclude the imposition of an implied duty to develop. The intent of the parties was for one of the dual purposes, and not necessarily both, to be served.

Columbia cites an unpublished Ohio Court of Appeals case which lends, at best, modest support for Columbia's position. *See Mauger v. Positron Energy Res., Inc.*, 2014-Ohio-4613 (Ohio Ct. App.). In *Mauger*, the parties were in the indefinite secondary term of a dual purpose oil and gas lease entered into in 1971. The lease provided for a royalty payment on the gas which was marketed from the premises and for a separate gas storage rental fee. The lessee at one point had operated a gas production well ("Mellor Well No. 2") on the premises but ceased production in 1995 during the secondary term. The landowner brought suit to quiet title, alleging that the lease had expired based on the lessee's failure to produce. The landowner also alleged that the lessee had breached the

implied covenant to develop. The trial court granted summary judgment to the landowner on both claims, but the court of appeals reversed. As to the first claim, the court of appeals held that the lessee had submitted some evidence that it was storing gas on the premises and a genuine issue of fact existed over whether the lease had expired. As to the claim for breach of the implied covenant, the court held:

> [T]he language of the Mellor Lease obviates the conclusion that reasonable minds could only find that Appellants breached the implied covenants. The Mellor Lease contemplates more than production of oil and gas on the Mauger property. The Mellor Lease also encompasses the injection, storage, or withdrawal of gas in or from the 125 acres of the Mauger property or other lands located in the same or any adjoining township. During the period of inactivity from Mellor Well No. 2, Appellants were withdrawing gas from the Lowe Unit and Putnam–Bragg Unit. The language of the Mellor Lease creates a genuine issue of fact whether Appellants breached the implied covenants.

2014-Ohio-4613, ¶ 68.

*Mauger* supports Columbia's position insofar as the court considered the other purposes of the lease and whether they were being accomplished in the court's discussion of the claim for breach of the implied covenant to develop. But the *Mauger* decision stopped short of holding that an implied covenant cannot be imposed in a dual purpose lease. The Court is not inclined to read further into *Mauger*, because it did not address the issue of the existence of an implied covenant separately from the issue of breach. The decision made reference to what the parties intended the purposes of the lease to be – which could bear on the legal issue of whether a court should impose the implied covenant – but then shifted its focus to breach, concluding that there was a genuine issue of fact whether the lessee had breached the implied covenant.

Columbia also cites *Penneco Pipeline Corp. v. Dominion Transmission, Inc.*, No. CIVA 05-49, 2007 WL 1847391 (W.D. Pa. June 25, 2007). The court in *Penneco* considered dual purpose oil and gas leases where the leases were in their secondary term and the lessee had stored gas but not produced oil or gas. The leases provided that "Lessee may drill or not drill on the leased premises, as it may elect, and that the consideration and rentals paid and to be paid constitute adequate compensation for such privilege." *Id.*, 2007 WL 1847391, at *7. The leases further provided that the lessee would pay annual gas storage rentals "in lieu of" royalties if there was no production. *Id.* The court found as an initial matter that the leases were still in effect because the lessee was storing gas on the premises. *Id.*, 2007 WL 1847391, at *14 ("[T]he lessee need not be engaged in both production and storage activities in order to extend the lease term."). The court next held that the production rights

and storage rights were not severable because the compensation provisions (delay rentals, royalties, and storage rentals) were "not distinctly allocated to production or storage rights, but rather, [were] written in such a way that payment for one purpose interrelates and impacts on the payment for the other." *Id.*, 2007 WL 1847391, at *16.

The court in *Penneco* next considered the implied covenant to develop. This was an issue on which the Pennsylvania Supreme Court had directly spoken and held that the implied covenant exists "where the only compensation to the landowner contemplated in the lease is royalty payments resulting from the extraction of that underground resource." *Jacobs v. CNG Transmission Corp.*, 565 Pa. 228, 244, 772 A.2d 445, 455 (2001). If "the parties have expressly agreed that the landowner shall be compensated if the lessee does not actively extract the resource, then the lessee has no implied obligation to engage in extraction activities." *Id.* In *Penneco*, the court applied this rule and found that an implied covenant did not arise because the compensation paid under the leases was not limited to royalties and was "not specifically apportioned to either production or storage rights." *Penneco*, 2007 WL 1847391, at *19.

The Court is not persuaded that the rationale and result in *Penneco* apply to this case. For one, the Ohio Supreme Court has not announced a clear rule like the one in *Jacobs* that the existence of the implied covenant to develop depends on the lease's compensation structure. But perhaps more importantly, the 1952 Lease does not contain "in lieu of" language providing that rental fees are in place of, and not in addition to, royalties. *Penneco*, 2007 WL 1847391, at *18 (applying *Jacobs* because the parties "agreed that storage rental fees or well storage fees are to be made in lieu of and not in addition to royalties, delay rentals, or other sums otherwise due under the leases").

The Court thus declines to adopt Columbia's broad proposition that the implied covenant to develop never arises under a dual purpose lease. The Court, however, agrees that it should consider the language and express purposes of the lease in determining whether the implied covenant should be imposed. Oil and gas leases are contracts and "are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Alford*, 152 Ohio St. 3d at 305, 95 N.E.3d at 385 (internal quotation marks omitted). The "rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument." *Id.* (internal quotation marks omitted).

### D. Divisibility

In their briefing, the parties assume that the implied covenant to develop either applies across-the-board to oil and gas rights both (plaintiffs' position) or that it does not (defendants'

position). The parties do not address whether the implied covenant could be imposed for oil rights but not gas rights, or vice versa.[5] A review of the 1952 Lease shows that the original contracting parties treated the compensation of oil rights separately from the compensation of gas rights. This leads the Court to believe that the issue of divisibility should be addressed. The Court's analysis is provisional for the purpose of resolving the current cross-motions and is without prejudice to reconsideration.

Whether a contract "is entire or divisible depends generally upon the intention of the parties." *Freeman Indus. Prods., L.L.C. v. Armor Metal Grp. Acquisitions, Inc.*, 193 Ohio App. 3d 438, 447, 952 N.E.2d 543, 550 (Ohio Ct. App. 2011) (internal quotation marks omitted). In determining the parties' intention, the court applies:

> [T]he ordinary rules of construction, considering not only the language of the contract, but also, in cases of uncertainty, the subject-matter, the situation of the parties, and circumstances surrounding the transaction, and the construction placed upon the contract by the parties themselves. If the part to be performed by one party consists of several distinct and separate items, and the price is apportioned to each item, payable at the time of delivery, the contract will generally be held severable. . . . The primary criteria in determining whether a contract is entire or divisible is the intention of the parties as determined by a fair consideration of the terms and provision of the contract itself, by the subject matter to which it has reference, and by the circumstances of the particular transaction giving rise to the question. A factor in determining whether a contract is entire or severable is whether the parties reached an agreement regarding the various items as a whole or whether the agreement was reached by regarding each item as a unit.

*Id.* (internal quotation marks omitted).

The 1952 Lease was preceded by the 1950 Lease, which contained a grant of oil and gas production rights. The 1952 Lease added gas storage rights, a modification which was common at that time. *See Penneco*, 2007 WL 1847391, at **4, 6 (explaining that as "the natural gas in the rock formations of Appalachia became depleted in the 1930s to 1940s, it became necessary to pipe gas in" from other areas and store it, such that existing production leases were modified in the 1950s to add storage rights). Though adding gas storage rights, the parties to the 1952 Lease kept in place an important aspect of the prior lease – a separation of how the grants of oil rights and gas rights would be compensated. The 1952 Lease, like the one before it, provides that the lessor will receive one-eighth of the oil produced and saved from the premises. The 1950 Lease provided that the landowner would receive a $200 annual rental payment for each well from which gas was marketed.

---

[5] The Reeds do argue that gas production rights can be severed from gas storage rights. The Court addresses this argument in Section V.E below.

The 1952 Lease expanded the rent to include wells for which gas is being injected, stored, or removed. *See* Doc. 57-4 at PAGEID 1259.

The Court provisionally finds that the 1952 Lease is divisible between oil rights and gas rights. The lease does not contain any language stating that it is entire and indivisible. Moreover, the lease apportions the compensation due for oil production independently from the compensation due for gas production or storage. The landowner receives one-eighth of the oil produced, irrespective of the number of wells for which gas is produced or stored. The landowner receives $200 a year for each gas well, irrespective of the amount of oil produced. Thus, a breach of the duty to pay oil royalties can arise separately from the breach of the duty to pay gas well rentals. *See Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 467 (6th Cir. 2013) (in determining under Ohio law if a contract was divisible, examining whether breaches of the contract's various parts "'give rise to separate causes of action'") (quoting 15 Williston on Contracts § 45.20 (4th ed. 2000)).

### E.     Whether an Implied Covenant Arises for Gas Production

Starting with gas production rights, the Court finds that no implied covenant to develop exists. The 1952 Lease provides for no royalites at all on gas production. Rather, the landowner receives an annual well rental. The parties expressly contemplated a possibility that gas would only be stored and not produced. And they agreed that storage alone would not only hold the lease but also provide a means of compensation for the landowner. Under Ohio law, the parties may preclude an implied covenant to develop by describing "the development of the land sought by the parties in the terms of the lease itself." *Alford*, 152 Ohio St. 3d at 306, 95 N.E.3d at 386. The development required by the 1952 Lease with respect to gas rights was to use the premises to either produce or store gas. Because Columbia has stored gas on the premises and paid the annual well rentals, the Court finds that it has developed the gas rights granted by the lease in a manner which satisfies the parties' purpose and gives the landowner the benefit of the bargain. *Cf. Penneco*, 2007 WL 1847391, at *19 (under Pennsylvania law, no implied covenant to develop arises if the landowner receives compensation other than royalties).

The Reeds argue that the storage rights are divisible from the production rights because the lease provides no compensation for gas production. They draw attention to the absence of the word "produced" in the clause which states that the lessee "shall pay for each gas well from the time and while gas is being marketed, injected, stored of removed an annual rental of Two Hundred Dollars ($200.00) payable quarterly." Doc. 57-4 at PAGEID 1259. They argue that because the lease does not compensate for gas production, the rights to gas production and gas storage are divisible.

24

As an initial matter, it is unclear how this argument, if accepted, would help the Reeds' cause. If the lease does not provide any compensation for gas production, then imposing an implied covenant to develop would not lead to any benefit to the Reeds. *Cf. Alford*, 152 Ohio St. 3d at 307, 95 N.E.3d at 387 (holding that it is appropriate to impose the implied covenant when it would protect the lessor's interest in "production and, hence, profits"). Under the Reeds' interpretation of the lease, even if Columbia were producing gas, the Reeds would not be entitled to any compensation.

In any event, the Court finds that the Reeds' interpretation is not a fair reading of the lease. The granting clause of the lease plainly gives to Columbia the right to produce gas. It is true that the compensation clause uses the term "marketed" and not "produced." In considering this possible discrepancy, the Court must read the lease as a whole and harmonize its provisions to give effect to each in a manner consistent with the parties' expressed intent. *See Reeder v. Reeder*, 2023-Ohio-2678, ¶¶ 26-27, 222 N.E.3d 734, 739 (Ohio Ct. App.). The use of the word "marketed" instead of "produced" makes sense in light of the house gas provision. If Columbia were operating only a single production well which produced no more than the allotment of house gas (300,00 cubic feet), then it would be something of a windfall for the landowner to also receive the $200 rental payment. The contracting parties thus required the rental payment for a production well only if gas was marketed from the well. *Cf. Moore v. Adams*, 2008-Ohio-5953, ¶ 38 (Ohio Ct. App.) (the duty to market is the duty to sell the gas produced). This conclusion is reinforced by the lease's repeated references to production in a "paying quantity." Doc. 57-4 at PAGEID 1258–59; *see Kuster v. Ohio Dep't of Tax'n*, 2021-Ohio-3721, ¶ 40 (Ohio Ct. App.) (holding that "domestic use of oil or gas is insufficient" to constitute a paying quantity). In other words, the landowner receives the well rental payment from a gas production well when there is enough gas to market and sell.

Accordingly, the gas production and storage rights are not divisible, and Court finds that an implied covenant to develop the gas rights is not imposed under Ohio law.

## F. Whether an Implied Covenant Arises for Oil Production

Turning now to oil production, the Court concludes that an implied covenant to develop arises under Ohio law.[6] As noted above, the 1952 Lease treats oil rights differently from gas rights. The landowner receives no compensation if the oil rights are not developed. Production is the only oil right granted and the compensation given to the landowner for that right is limited to one-eighth

---

[6] This conclusion is premised upon the Court's provisional finding that the oil rights are divisible from the gas rights.

of the oil produced. This is unlike the gas rights, for which the parties agreed that either production or storage would satisfy their intent as to how gas rights would developed and for which the parties provided compensation other than royalites.

Columbia emphasizes that it can hold the oil rights for so long as gas is stored on the premises. The Court believes that the issue of whether the lease continues to be valid into the secondary term is a different issue from whether the implied covenant arises. The Court's conclusion is guided by the decision in *Mosholder v. Briar Hill Stone Co.*, 2023-Ohio-1280, 213 N.E.3d 226 (Ohio Ct. App.).[7] In *Mosholder*, the parties entered into a mineral rights lease to quarry stone in exchange for a royalty payment. The lessee could hold the lease after the primary term so long as it quarried stone, provided that it paid an annual delay rental if it did not quarry stone. The lessee did not quarry stone during the 15-year primary term or 13 years into the secondary term, but it did pay the delay rental each year. The landowner brought suit for breach of the implied covenant to develop. Applying *Claugus*, the court held that delay rental payments precluded the implied covenant only during the definite primary term. *Id.*, 2023-Ohio-1280, ¶ 19, 213 N.E.3d at 230. The court further held that during the secondary term, the lessee could not be allowed to indefinitely hold rights by paying the delay rental:

> Briar Hill argues it had no duty to develop, even in the secondary term, because it was holding the lease in reserve. Briar Hill claimed its business needs require that it have a ready reserve of stone in the event temporary demand exceeds current capacity. This may be so, but Ohio has long required that mineral leases must have development during the secondary term, otherwise the lease is against public policy. [*Claugus*, 145 Ohio St. 3d at 184, 47 N.E.3d at 841]. Thus, we conclude Briar Hill is in breach of its obligation to reasonably develop the property.

*Id.*, 2023-Ohio-1280, ¶ 21, 213 N.E.3d at 230.

The *Mosholder* decision refutes Columbia's argument that simply holding a lease during the secondary term is sufficient to preclude the implied covenant from arising. The Court believes that Ohio courts would consider the principles set forth by the Ohio Supreme Court in *Claugus*, *Ionno*, and *Alford* in resolving the issue presented in this case. The 1952 Lease does not preclude the implied covenant to develop by setting forth how development of oil rights should occur in the secondary term. *See Claugus*, 145 Ohio St. 3d at 186–87, 47 N.E.3d at 843 (implied covenant will not arise if the lease states how the rights are to be developed). The purpose of the implied covenant to

---

[7] The *Mosholder* decision was issued by the same court, the Ohio Fifth District Court of Appeals, that decided *Mauger*. The result in *Mosholder* supports this Court's view that *Mauger* should not be read as broadly precluding implied covenants.

develop is to protect the landowner's interest in profits when royalties are the form of compensation given for production. *See Alford*, 152 Ohio St. 3d at 307, 95 N.E.3d at 387. Here, the protection of the implied covenant is needed because if Columbia merely holds the oil production rights, the Reeds have no opportunity to receive compensation. And in this regard, Columbia could hold the rights indefinitely (so long as it stores gas) without developing the oil interests, which is against public policy. *See Ionno*, 2 Ohio St. 3d at 134, 443 N.E.2d at 508. *See also* 68 Ohio Jur. 3d Mines and Minerals § 64 ("If the consideration for a mining lease is an agreement to pay a royalty on the product extracted, it is the implied intention of the parties that the lease is executed for the mutual profit of the lessor and the lessee and that the lessee will start operations, develop the premises within a reasonable time, and will use ordinary diligence in removing the product covered by the lease."); 53A Am. Jur. 2d Mines and Minerals § 208 ("[W]here the principal consideration to the lessor is the expectation of receiving royalties, there is an implied obligation on the part of the lessee to explore and develop the premises diligently so that the lessor may obtain the expected income that induced the lessor to grant the lease.").

Accordingly, the Court finds that an implied covenant to the develop the oil rights arises under the 1952 Lease.

### G.     Breach of the Implied Covenant to Develop Oil Production Rights

#### 1.     The Nature of the Duty

When an implied covenant to develop is imposed, the lessee owes a duty to engage in "reasonable development" of the mineral interests. *Alford*, 152 Ohio St. 3d at 308, 95 N.E.3d at 387. Lessees are to "'work the land with ordinary diligence, not simply for their own advantage and profit, but also so that lessors may secure the actual consideration for the lease, i.e., the production of minerals and the payment of a royalty on the minerals mined.'" *Id.* (quoting *Ionno*, 2 Ohio St.3d at 134, 443 N.E.2d 504). The implied covenant is not "one-sided in favor of landowners," as the law recognizes "that lessees face various risks in any oil and gas lease, including substantial upfront investments with an uncertain potential for returns." *Id.* Lessees have "only the obligation to act as a reasonably prudent operator would as it develops the land under the lease." *Id.*, 152 Ohio St. 3d at 308, 95 N.E.3d at 387–88 (citing *Harris*, 57 Ohio St. at 127, 48 N.E. at 502).

"Whether the lessee has breached the implied covenant of reasonable development should be determined by the facts and circumstances of each particular case." *Alford*, 152 Ohio St. 3d at 308, 95 N.E.3d at 388. The inquiry entails consideration of the "surrounding circumstances," including the likelihood of productivity, the associated costs of exploration and production, and the

market for the product. *Ohio Fuel Supply Co. v. Shilling*, 101 Ohio St. 106, 109, 127 N.E. 873, 874 (1920) (per curiam); *accord Alford*, 152 Ohio St. 3d at 308, 95 N.E.3d at 388. "The question is whether a prudent operator would further develop the land upon considering the interest of both the lessee and lessor and all factors relevant to development including: the costs of exploration; the likelihood exploration will result in production at or above a particular level; the market conditions; the geological environment; and any adjoining activity." *Pavsek v. Wade*, 2019-Ohio-5250, ¶ 20, 136 N.E.3d 1283, 1289 (Ohio Ct. App.).

The burden is on "the plaintiff to establish failure of performance of the implied covenant for reasonable development." *Updegraff v. United Fuel Gas Co.*, 67 F.2d 431, 432 (6th Cir. 1933). Plaintiffs must put forth evidence tending to show that oil exists under their lands "in sufficient quantity to warrant the expense of drilling and marketing." *Ohio Fuel Supply*, 101 Ohio St. at 109, 127 N.E. at 874. In the context of a gas lease, the Ohio Supreme Court characterized the burden on plaintiff as showing there is "productive gas, of sufficient quantity to warrant operations, under the lands of the lessor." *Id.*, 101 Ohio St. at 108, 127 N.E. at 874; *see also* 68 Ohio Jur. 3d Mines and Minerals § 70 (stating that "the burden to establish that there was productive gas of sufficient quantity to warrant operations under the lands of the lessor" is on the party asserting a breach of the implied covenant). Plaintiffs cannot sustain a claim for breach of the implied covenant to develop based upon speculation. *See Bucher v. Plymouth Oil & Gas Co.*, 107 Ohio St. 73, 74, 140 N.E. 940, 941 (1923) (per curiam).

### 2. Plaintiffs' Motion for Summary Judgment

The Reeds have moved for summary judgment, but their motion is based on several flawed assumptions and arguments. First, they mischaracterize the nature of Columbia's duty. They call it a covenant to "produce" and argue that Columbia has breached the covenant by failing to have any production. Doc. 60 at PAGEID 2706. The case law makes clear that the covenant is one of reasonable development, not production, and it is "not automatically breached by the passage of time" without production. *Pavsek*, 2019-Ohio-5250, ¶ 20, 136 N.E.3d at 1289. The Reeds also describe the covenant as one to "explore" and argue that Columbia has breached by failing to use up-to-date technology to look for reserves below their land. Doc. 68 at PAGEID 3238. But the Ohio Supreme Court in *Alford* expressly rejected the existence of an implied covenant to explore. *Alford*, 152 Ohio St. 3d at 309, 95 N.E.3d at 388 ("We therefore hold that under Ohio law concerning oil and gas leases, there is no implied covenant to explore further separate and apart from the implied covenant of reasonable development.").

The Reeds also misstate the burden of proof.  They argue without support that Columbia bears the burden of proving that the land is not producible.  *See* Doc. 60 at PAGEID 2711; Doc. 68 at PAGEID 3236.  The burden, however, is on plaintiffs to show that oil exists under their land in a quantity sufficient to cause a reasonably prudent operator to drill and market.  *See Ohio Fuel Supply*, 101 Ohio St. at 109, 127 N.E. at 874; 68 Ohio Jur. 3d Mines and Minerals § 70 ("The burden of proof is not on the lessee to negate the existence of gas that would make development practicable.") (footnote omitted).

The Court finds that the Reeds' motion for summary judgment must be denied.  Not only have they misapprehended the nature of the duty and the burden of proof, but they candidly admit that they cannot "prove whether or not there are oil reserves below the Reeds' Property, let alone whether those reserves exist in payable quantities."  Doc. 66 at PAGEID 3205; *see also* Doc. 60 at 2711 (acknowledging that Columbia can create a dispute of fact over whether the land has producible reserves).

The Reeds' expert, petroleum engineer Wes Casto, offered testimony to the same effect.  He testified that he could not say that producible reserves actually exist under the Reeds' property.  *See* Doc. 59-3, Casto Dep. at 69 (testifying that he was not claiming there are producible reserves); *id.* at 122 (not claiming there are commercially viable quantities).  He stated that the likelihood of reserves existing is "low," but said that 3D seismic survey data would be needed before the exact likelihood could be quantified.  *Id.* at 70; *id.* at 123, 127 (cannot determine the likelihood of viable reserves without more information).  In both his deposition testimony and expert report, Casto ventured no further than stating that the Reeds' land has a "potential" for productivity and that "there is a possibility that oil and/or gas may be present."  *Id.* at 69, 71–72; Doc. 59-3, Ex. 2, Casto Report at pp. 4, 7.  Based on the information currently available to him, Casto stated that he would not invest money in drilling a well on the Reeds' land.  *Id.* at 72.

The Court finds that plaintiffs have fallen well short of meeting their burden at summary judgment.  They have failed to put forth evidence showing that oil exists under their land in sufficient quantities to warrant the expense of drilling and marketing.

### 3.    Columbia's Motion for Summary Judgment

In contrast, Columbia has conclusively demonstrated that it took reasonable steps to develop its interests, and the Court finds that its motion for summary judgment should be granted. Columbia contracted with Columbia Natural Resources and an outside party, Murphy Oil, to conduct oil and gas exploration from 1995 to 2001 in the region where the Reed's property is

located. *See* Cable Dep. at 97–101. Columbia spent "millions and millions" of dollars to run "extensive" 2D seismic surveys throughout Hocking County. *Id.* at 99–101. The surveys identified areas of likely oil or gas reserves, and, based on the survey results, CNR drilled 48 wells in Hocking County. *See id.* at 101, 106–107. The average cost for each well (counting the seismic survey and drilling) was about $500,000. *See id.* at 110.

Seismic surveys were run specifically on the Reeds' property. *See id.* at 101, 106; J. Reed Dep. at 78–79, 158. Though some wells were drilled within a three-mile radius of their land, importantly, no wells were drilled on the Reeds' property. *See* Cable Dep. at 101, 106; J. Reed Dep. at 158. According to Columbia's expert, petroleum engineer and mineral assets manager Jeffrey Cable, the fact that no wells were drilled on the Reeds' land means that CNR "did not locate any viable reserves beneath the property owned by [the Reeds]." Cable Decl., ¶ 8; *accord* J. Reed Dep. at 158 (testifying that he believed the seismic testing of his land did not locate any viable reserves). Had the seismic surveys of the Reeds' land located the presence of potentially viable reserves, CNR would have drilled a well. *See* Cable Decl., ¶ 8 (explaining that CNR drilled a well only if seismic surveys identified potentially viable reserves); Cable Dep. at 115 (". . . CNR never drilled a Knox well without seismic."); *id.* at 122 ("If there was a location to drill on the Reed property, I believe that CNR would have drilled it.").

Moreover, Columbia has produced evidence that of the 48 wells which CNR drilled in Hocking County, 26 were "dry holes" and another 15 wells "likely did not provide a return on investment." Cable Decl., ¶ 7. Three wells "may or may not have had a return on investment" and 4 wells "likely had a return on investment." *Id.* According to Cable, these results – comparing the 41 dry and likely unproductive wells against the 4 likely productive wells – equated to a "high rate of failure" for which it was not economically viable to pursue further development. *Id.*

In response to Columbia's motion, the Reeds again incorrectly argue that Columbia bears the burden to show the land cannot produce in "paying quantities." Doc. 66 at PAGEID 3205. The Reeds' confusion over this issue stems from their reliance on cases evaluating a lessee's decision to cease operating a once-producing well. *See, e.g., Kraynak v. Whitacre*, 2018-Ohio-2784, ¶ 16 (Ohio Ct. App.) ("The party who asserts the claim that the well is not producing in paying quantities carries the burden of proof."); *Fox v. Positron Energy Res., Inc.*, 2017-Ohio-8700, ¶ 13, 101 N.E.3d 1, 5 (Ohio Ct. App.).

The Reeds point out that there have been productive wells within a three-mile radius of their property, and there is evidence to support this assertion. Casto's expert report lists 13 wells within a

three-mile radius which have produced oil from the Knox formation. *See* Casto Report at p. 6. However, the Reeds fail to explain how this fact would make it more likely than not that their property has viable oil reserves. Casto testified that such an inference could not be drawn. According to him, the nature of mineral reserves in the Knox formation is "highly variable" and it cannot be said whether it is more likely than not that the Reeds' land contains viable reserves. *Id.* at p. 6. Productivity in the Knox formation can "drastically change" from one well to another nearby because "the petrophysical properties are highly variable." Casto Dep. at 41–42. "Small differences" in a petrophysical property like porosity, permeability, or hydrocarbon saturation can "dramatically change" the productive potential in "one well versus one nearby to it." *Id.* Columbia's expert agreed. *See* Cable Dep. at 118–20 (testifying to the irregular nature of the Knox formation). Casto stressed he could opine only that there is a possibility, not a probability, that oil or gas is present under the Reeds' land, and he viewed the likelihood of viable reserves actually existing as low. Casto Dep. at 69–72, 123, 127.

The Reeds further argue that Columbia's 2D surveys are obsolete and a reasonable operator would run 3D seismic surveys to determine if reserves likely exist below their property.[8] There is no dispute that 3D surveys are of better quality than 2D surveys. *See* Cable Dep. at 99; *Nat. Res. Def. Council v. Nat'l Park Serv.*, 250 F. Supp. 3d 1260, 1275 (M.D. Fla. 2017). However, the Reeds have not pointed to evidence showing that the 2D surveys conducted by Columbia are unreliable. Nor does the testimony of Casto or Cable support a conclusion that a reasonably prudent operator in Columbia's position would now conduct 3D surveys of the Reeds' land.

Casto testified that "if 2D seismic shoots are done strategically, they can be effective with identifying Knox remnants." Casto Dep. at 34. Casto did not opine on the reliability of the survey results obtained by Columbia for the Reeds' property and in Hocking County, as he stated that he was not qualified to interpret seismic surveys. *Id.* at 38, 67–68. Cable testified that an operator today would still rely on the results of the 2D seismic surveys conducted from 1995 to 2001. He testified that because the Reeds' land has "already been explored," an operator would not explore it currently. Cable Dep. at 101 (stating that "an operator is not going to try to go and explore an area that's already been explored. They're looking for areas that have not been drilled, so that's why I'm saying there's no market for that acreage . . . .").

---

[8] It should be clarified that 2D seismic surveys are still done today, *see* Casto Dep. at 60, and that 3D seismic technology was in use by sometime in the mid-1990s, *see id.* at 64, at the time CNR was conducting the 2D seismic surveys of the Reeds' land and nearby areas in Hocking County.

Moreover, the Reeds have not put forth evidence to support an inference that a reasonably prudent operator would incur the costs of conducting 3D surveys of the Reeds' land in light of the results of Columbia's prior exploration. Again the testimony of plaintiffs' own expert supports Columbia's position that a prudent operator would not run 3D surveys. Given the "significant capital associated with shooting 3D seismic," Casto testified that it "wouldn't make economic sense" to conduct 3D surveys "unless you had a reasonable expectation of being able to recoup that expense through production." Casto Dep. at 51; *see also* Cable Dep. at 62–63 (stating that the cost of conducting and processing 3D surveys is "very expensive," about $115,00 per square mile); Casto Report at p. 6 (same). Casto also testified that he was unaware of 3D surveys being done for an area as small as the Reeds' land, which is about 80 acres. Casto Dep. at 60. Because of the cost, 3D surveys are done in "increments of square miles." *Id.* at 53; *see also id.* at 60–61 (testifying that one square mile, or 640 acres, is the smallest 3D survey he is aware of). Casto noted that a 2D survey could be done on a small property "for a much lower capital layout." *Id.* at 60. Of course, a 2D survey was run on the Reeds' land and the results did not prompt Columbia to drill a well.

Finally, the Court notes a critical flaw in the Reeds' request for relief. They state that they are seeking only the forfeiture of Columbia's production rights and do not seek monetary damages. Under an oil and gas lease, the lessee's "breach of the above implied covenant [to develop], however, is not itself sufficient to work a forfeiture." *Beer v. Griffith*, 61 Ohio St. 2d 119, 121, 399 N.E.2d 1227, 1230 (Ohio 1980). The "remedy for a breach of an implied covenant, without more, is damages, and not forfeiture of the lease, in whole or in part." *Id.*, 61 Ohio St. 2d at 119, 399 N.E.2d at 1229 (paragraph three of the syllabus) (citing *Harris*, 57 Ohio St. 118, 48 N.E 502). Forfeiture of rights is an "extreme measure," and "the lessor has the burden of proving damages are inadequate before such forfeiture may be declared." *Ionno*, 2 Ohio St. 3d at 135, 443 N.E.2d at 508; *see also Hartline v. Statoil USA Onshore Props., Inc.*, No. 2:16-CV-315, 2017 WL 1014377, at *4 (S.D. Ohio Mar. 14, 2017) ("Under Ohio contract law, forfeitures are abhorred."); 53A Am. Jur. 2d Mines and Minerals § 215 ("[F]orfeiture is harsh, coercive, and disfavored.").

The Reeds have not made a showing that damages would be an inadequate remedy. While they claim that "damages would be near[ly] impossible to calculate," Doc. 66 at PAGEID 3205, a failure of proof on their part does equate to inadequacy. Courts look to whether a damages award would "assure the development of the land and the protection of lessor's interests." *Beer*, 61 Ohio St. 2d at 122, 399 N.E.2d at 1230; *see also Ionno*, 2 Ohio St. 3d at 135, 443 N.E.2d at 508 (forfeiture can be appropriate when "necessary to do justice to the parties"); *Jacobs v. Dye Oil, LLC*, 2019-Ohio-

4085, ¶ 88, 147 N.E.3d 52, 72–73 (Ohio Ct. App.). For instance, in *Beer* damages were an inadequate remedy because the lessee's "financial and operating difficulties" meant that it lacked the resources necessary to develop the unexploited acreage. *Beer*, 61 Ohio St. 2d at 122, 399 N.E.2d at 1230. Here, if Columbia were found to be in breach, there is no such concern about Columbia's financial wherewithal to pay a damages award or to conduct operations to develop the oil interests.

The Court thus finds that Columbia is entitled to summary judgment on plaintiffs' claim for breach of the implied covenant to develop the oil rights.

## VI.    Conclusion

For the reasons stated above, plaintiffs' motion for partial summary judgment (Doc. 60) is DENIED, and defendants' motion for summary judgment (Doc. 61) is GRANTED. The Clerk of Court shall enter judgment for the defendants.


*James L. Graham*
JAMES L. GRAHAM
United States District Judge


DATE: May 22, 2025